United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LEWIS DALE BANKSTON,

    Petitioner,

  v.

BEN CURRY, Warden,

    Respondent.
                                 /

No. C 07-1819 CRB

**ORDER DENYING HABEAS CORPUS PETITION**

Petitioner Lewis Dale Bankston ("Bankston") has filed a petition for habeas corpus, challenging the California Board of Prison Terms' ("the Board") determination that he was unsuitable for parole. For the reasons discussed below, this Court finds that the Board's decision was supported by "some evidence." Accordingly, Bankston's petition for habeas corpus is DENIED.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.  The Commitment Offense**

On the night of October 8, 1985, Bankston's fiancee was killed by a single gunshot to the head. The shooting occurred shortly after Bankston and his fiancee had retired to his bedroom, after having spent the evening with neighbors.

Bankston maintained at the time, and continues to maintain, that the shooting was an accident. Though he claims to have only a vague memory of the night of the murder, he alleges that the night transpired as follows: When the couple entered his bedroom, Bankston

placed what he thought was an unloaded revolver on the headboard of his waterbed. He and his fiancee then began to "maneuver" on the bed. These maneuvers jostled the headboard, which caused the gun to fall. Upon impact with the bed, the gun discharged, killing the victim. Bankston picked the gun up after it discharged and left the room, without stopping to clean his hands or otherwise conceal evidence of a crime. He then ran to the neighbors to seek their help and call the authorities.

Bankston's account, however, was not supported by physical evidence from the scene. Extensive testing of the headboard and bed clothing failed to reveal any gunpowder residue, indicating that the gun had not discharged while in contact with either surface. Moreover, a forensic expert testified at Bankston's trial that Bankston's revolver had to have been fired by a pull of the trigger and could not have discharged in the manner Bankston described.

Bloodstains at the scene also undermined Bankston's story. Such stains were found inside the bathroom door and on the doorjamb, signaling that Bankston had entered the bathroom after the shooting. The victim's blood was also found in a groove at the base of two bullets that had been placed on the headboard. This fact ran counter to Bankston's contention that he had unloaded the weapon before the shooting. It also suggested that Bankston had wiped blood off of the bullets before placing them on the headboard, another indication that Bankston had attempted to cover-up the crime.

Though he testified at trial, Bankston was unable to provide an explanation for this contradictory physical evidence. Nor has he done so in the years since the night of the shooting.

Following a trial at which Bankston's story and the above evidence was presented, a jury convicted Bankston of second-degree murder. He was subsequently sentenced to a term of fifteen years to life with a two year consecutive enhancement for use of a firearm. He began his sentence on May 8, 1986.

2

**B.     Procedural Background**

**1.     Bankston's Initial Parole Hearings**

Bankston's initial parole hearing occurred on March 3, 1996, almost ten years after he was first incarcerated. Though the Board commended Bankston for his "disciplinary-free behavior", it concluded that he was unsuitable for parole at the time. In support of this determination, the Board cited the "especially atrocious, cruel and callous manner" in which Bankston's crime was committed, the fact that he had programmed in a limited manner while in prison, and the fact that he had not participated in sufficient "self-help and therapy programming." The Board further concluded that Bankston needed "therapy in order to face, discuss, understand and cope with stress in a nondestructive manner."

In May 1999, the Board denied Bankston parole for a second time. Again the Board identified the callousness of Bankston's crime and his insufficient participation in "beneficial self-help and therapy programming" as evidence of Bankston's unsuitability for parole. Among other things, it recommended that Bankston "participate in available self-help and therapy programming."

Bankston's third parole hearing, in August 2002, likewise resulted in the denial of parole. The Board again emphasized the callousness of Bankston's offense, including the fact that the "motive for the crime was inexplicable and very trivial." It also concluded, as it previously had, that Bankston had failed to participate in adequate self-help or therapy.

In addition to these justifications, the Board explicitly cited, for the first time, Bankston's lack of insight into his crime as a ground for its denial of parole. This lack of insight was evidenced by Bankston's continued assertion that the shooting was an accident and that he had not fired the murder weapon. It was also supported, in the Board's view, by the report of pscychologist Steven Terrini. Although Terrini, like several previous psychologists, had concluded that Bankston posed a low risk to the community, the Board noted that his report indicated that Bankston had shown only "some insight into his commitment offense."

3

After announcing its decision, the Board again recommended that Bankston "participate in therapy in order to face, discuss, understand and cope with stress in a nondestructive manner."

### 2. Bankston's First State Habeas Petition

Following this third denial of parole, Bankston filed a petition for habeas corpus in California Superior Court, arguing that the Board's decision was arbitrary and capricious. The Court agreed with Bankston, and, in December 2004, granted his petition.

The Court found the Board's 2002 decision lacking in several respects. First, the court concluded that the Board's determination that Bankston had committed his crime in an especially callous manner was in error because the Board had failed to "weigh Bankston's conduct against other instances of the same crime or crimes" before making that determination.[1] Second, the court found no support in the record for the Board's conclusion that Terrini's report was not totally supportive of release. The court likewise found no support in the record for the Board's conclusion that Bankston needed additional therapy. The court noted, specifically, that Terrini and previous psychologists had given Bankston a clean bill of mental health.

To remedy these errors, the court ordered the Board to hold a new parole hearing. The court further instructed the Board that, in reaching its next decision, it had to "consider Bankston's psychological profile as a factor favoring his application for a parole date unless a new psychological evaluation supports a different conclusion." The court also required the Board to "consider Bankston's work history, education, volunteer work, and disciple [sic] free incarceration as factors supporting his application for parole."

### 3. The March 23, 2005 Parole Hearing

On March 23, 2005, the Board held the hearing ordered by the court. That hearing and its result are the subject of the petition now pending before this Court.

---

[1] Subsequent to the Superior Court's decision granting Bankston habeas relief, the California Supreme Court held, in *In re Dannenburg*, 34 Cal. 4th 1061 (2005), that the Board need not compare the potential parolee's crime to other similar crimes in order to determine whether the crime was carried out in an especially callous manner. *Id.* at 1098.

4

1    At the March 2005 hearing, the Board heard testimony from Bankston and several members of the victim's family.  The Board also read into evidence a psychological report authored by Dr. Steven Walker, who had examined Bankston on January 6, 2005.  Walker, like his predecessors, considered Bankston to present a relatively "low risk of future violence."  He noted, however, that Bankston "remains adamant that the killing of his girlfriend was a horrible accident."  Because of Bankston's "denial of events as reportedly transpired," Walker raised his estimate of Bankston's current risk of future violence from "low" to "low to moderately low."  Walker also opined that "[o]ngoing education, and involvement in self-help, self study (bibliotherapy), or introspective treatments groups (if available to life term inmates without mental health issues) is encouraged, but his group treatment should not be considered mandatory."

   At the end of the hearing, the Board again denied parole.  The Board began its report of the decision by noting that, as instructed by the California Superior Court, it had considered Bankston's work history, his education, his volunteer work, and his discipline-free incarceration as factors supporting his parole.  It also found that Bankston had solid parole plans.

   Notwithstanding these positive findings, the Board concluded that Bankston was "not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety," for several reasons.

   First, the Board again found that Bankston had committed the offense in an "exceptionally callous" manner.  As evidence of the callousness of the offense, the Board cited the fact that the victim "was in a position of trust with Mr. Bankston" and the fact that the motive for the crime, the victim's threat to break up with Bankston, was "very trivial."

   Next, the Board averred that Bankston had "programmed in a limited manner while incarcerated" and had "not sufficiently participated in beneficial self-help."  With respect to his programming, Bankston had failed to provide a previously requested copy of his diploma and had not supplied documentation of his participation in as a woodworker in a furniture making program.  Regarding self-help, the Board noted that Bankston's "most recent self-

5

help" was a four hour video in July of 2002 and that most of his self-help consisted of his participation in programs to help juveniles in the early 1990s. Bankston had not engaged in self-help or therapy directed at his ability to deal with stress in a non-destructive manner.

Third, the Board concluded that Bankston was unsuitable for parole because he lacked sufficient "insight" into his crime. Specifically, the Board found that it was "just simply . . . contradictory that Mr. Bankston could have good insight when his explanation of this offense is contrary to the physical evidence of this offense."

Finally, the Board noted that members of the victim's family and a fearful witness opposed a finding of suitability.

Based on the above findings, the Board denied parole for three years and recommended that Bankston "remain disciplinary free; if and when available, upgrade vocationally and educationally; also, in lieu of that, provide documentation of his high school graduation and his vocational skills; and to participate in self-help where and when available." One Commissioner, speaking separately, recommended to Bankston that he seek out self-help that specifically "address[es] your relationships with women."

### 4. Bankston's Motion for Contempt

Following the Board's decision, Bankston filed a motion in California Superior Court asking the court to hold the Board in contempt. In Bankston's view, the Board had violated the Superior Court's habeas order by, among other things, failing to consider Bankston's psychological profile, his education, his work history and his volunteer work as factors favoring parole.

The court denied Bankston's contempt motion, finding that Bankston "ha[d] not established that the Board was in willful violation of the Court's order." The denial was subsequently affirmed on appeal.

### 5. The Current Habeas Petition

Having failed to secure an order holding the Board in contempt for its March 2005 decision denying parole, Bankston filed a habeas petition in California Superior Court in which he challenged the decision directly. This time around the Superior Court denied

6

1 Bankston's petition, concluding that "some evidence" supported the Board's denial of parole.
2 The California Court of Appeal summarily affirmed the Superior Court's decision in July
3 2007, as did the California Supreme Court in May 2008. Bankston thereafter filed the
4 petition now pending before this Court.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a writ of habeas corpus unless it finds that the state court's adjudication on the merits was either (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d)(1-2).

"California Penal Code section 3041 vests [Bankston] and all other California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) (citations omitted). At the time that Bankston's state habeas petition was before the state courts, "the Supreme Court had clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record.'" *Id.* (citing *Superintendent v. Hill*, 472 U.S. 445, 457 (1985)); *see also Biggs v. Terhune*, 334 F.3d 910, 915 (9th Cir. 2003) ("In the parole context, the requirements of due process are satisfied if 'some evidence' supports the decision [to deny parole].").[2]

Moreover, when this court evaluates whether a parole board's decision was supported by "some evidence" in a habeas case, the Court's "analysis is framed by the statutes and

---

[2] The State argues that use of the "some evidence" standard in the parole context is not clearly established Supreme Court law for AEDPA purposes. The Ninth Circuit expressly rejected this argument in *Sass v. Calif. Bd. of Prison Terms*, 461 F.3d 1123, 1129 (9th Cir. 2006) ("We therefore reject the state's contention that the some evidence standard is not clearly established in the parole context."), and has adhered to this view in subsequent cases. *See, e.g., Irons*, 505 F.3d at 850-851. Though the State maintains that the Ninth Circuit is reconsidering this holding, it has not yet done so and this Court is therefore bound by it.

7

regulations governing parole suitability determinations in the relevant state." *Id.* at 851. "Accordingly, here [this Court] must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence'" was a reasonable application of the "some evidence" standard. *Id.*

## DISCUSSION

Under California law, "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the [Board] the prisoner will impose an unreasonable risk of danger to society if released from prison." *In re Dannenburg*, 34 Cal.4th at 1080 (quoting *Cal. Code of Regs., tit.* 15 § 2402(a)). The Board decides whether a prisoner is too dangerous to be suitable for parole by weighing factors "tending to show unsuitability" for parole, as set forth in *Cal. Code Regs., tit.* 15 § 2402(c), against factors "tending to show suitability," as set forth in *Cal. Code Regs., tit.* 15 § 2402(d). For habeas purposes, the test, however, is not whether "some evidence" supports a particular factor or factors indicating unsuitability, but rather whether "some evidence" supports the Board's ultimate conclusion that "a parolee's release unreasonably endangers public safety." *See In re Lee*, 143 Cal. App. 4th 1400, 1408-09 (2006); *Dannenburg*, 156 Cal. 4th at 1400.

**A.    The Board's March 2005 Unsuitability Determination**

As an initial matter, it is undisputed that several factors "tending to show suitability" exist in Bankston's case. *See Cal. Code Regs., tit.* 15 § 2402(d). Bankston's "institutional behavior" has been exemplary. § 2402(d)(9). He has no juvenile record or other criminal history. § 2402(d)(1) & (6). He also has "realistic plans for release." § 2402(d)(8). These plans include a regular income, substantial savings and a residence which he owns. Bankston also appears to have maintained "reasonably stable relationships with others," including his parents, a son, and a girlfriend. § 2402(d)(2).

At Bankston's 2005 parole hearing, the Board recognized many of these positive factors. It nonetheless concluded that "currently the positive aspects of [Bankston's]

1 behavior do not outweigh the factors of unsuitablility." It is this conclusion that Bankston
2 now challenges.

3       The Board provided four reasons why it considered Bankston unsuitable for parole,
4 despite the various factors weighing in his favor. Those reasons were: (1) the "exceptionally
5 callous" nature of the commitment offense; (2) Bankston's failure to participate in sufficient
6 programming and beneficial self-help; (3) Bankston's lack of insight into his crime; and (4)
7 statements from the victim's family members opposing parole. As explained below, this
8 Court finds that the Board's second and third justifications for denying parole are supported
9 by the record and provide "some evidence" that Bankston poses an unreasonable risk of
10 danger to society. Accordingly, the Board's decision did not result in a denial of due
11 process.

12       Bankston devotes the bulk of his petition to a challenge to the Board's first finding –
13 i.e., that the especially cruel and callous manner in which the commitment offense occurred
14 indicates that Bankston currently poses an unreasonable risk of danger the public. Bankston
15 argues both that the crime was not "especially cruel," and, even assuming it was, the passage
16 of significant time has negated the relevance of the commitment offense as a measure of
17 Bankston's current dangerousness.

18       Whether the circumstances of Bankston's commitment offense, standing alone,
19 provide "some evidence" of his current dangerousness is a close question. Section
20 2402(c)(1), which defines the first unsuitability factor, states that a parolee may be unsuitable
21 if he committed his offense "in an especially heinous, atrocious or cruel manner." The
22 provision then provides a list of five factors that the Board must consider in determining
23 whether the offense was committed in an "especially heinous, atrocious or cruel manner."
24 Here, the Board relied on two of those factors: § 2402(c)(1)(D)("The offense was carried out
25 in a manner which demonstrates an exceptionally callous disregard for human suffering.")
26 and § 2402(c)(1)(E)("The motive for the crime is inexplicable or very trivial in relation to the
27 offense").
28

9

1    The Court agrees with Bankston that the record does not support a finding that
2 Bankston committed his offense with an "exceptionally callous disregard for human
3 suffering." The only evidence that the Board cites in support of its "exceptionally callous"
4 finding is that Bankston's victim was "in a vulnerable position" because she "was in a
5 position of trust with Mr. Bankston." This situation, however, exists every time the murder
6 victim is a close relative or friend of the murderer. While the murder of a loved one is
7 undoubtedly callous, the close relationship between the victim and the murder does not
8 render the murder *per se* "exceptionally callous." *See, e.g., In re Smith*, 114 Cal. App. 4th
9 343 (husband's murder of his wife was not "exceptionally callous").

10    Moreover, under California law, a crime that manifests an "exceptionally callous
11 disregard for human suffering" is one where the killer "tormented, terrorized, or injured the
12 victim; or . . . gratuitously increased or unnecessarily prolonged [the victim's] pain and
13 suffering." *In re Smith*, 114 Cal. App. 4th at 367; *see also In re Van Houten*, 116 Cal. App.
14 4th 339, 351 (2004) (murder was committed in an "exceptionally callous" manner where the
15 killer stabbed the victim repeatedly with a knife and a bayonet and the victim was made
16 aware that her husband was suffering a similar fate); *In re Dannenburg*, 34 Cal.4th at 1095
17 (finding that murderer demonstrated an "exceptionally callous disregard for human
18 suffering" where he "struck multiple blows to his wife's head with a pipe wrench" and then
19 placed her head in water until she drowned).

20    Here, there is no evidence that Bankston tortured or tormented his victim or otherwise
21 prolonged her suffering. As in *In re Smith*, the physical evidence established that Bankston's
22 victim died instantly of a single gunshot wound to the head. 114 Cal. App. 4th at 367
23 (husband's murder of his wife was not "exceptionally callous" where he shot her in the head
24 and she died "instantly"); *see also In re Scott*, 119 Cal. App 4th 871, 891 (2004) (holding
25 that there was no evidence to support an "exceptionally callous" finding where killer shot
26 victim once in the head and once in the thigh). In short, there is no evidence in the record
27 that supports a finding that Bankston committed his crime in a "manner which demonstrates
28 an exceptionally callous disregard for human suffering."

10

1        It is true, however, that the motive for Bankston's crime was fairly trivial.  According
2   to evidence presented at trial, the murder was precipitated by the victim's threat to break-up
3   with Bankston.  Bankston argues that a "breakup . . . motive [is] more commonplace than
4   rare or trivial."  But it is precisely the commonplace nature of the situation – the potential
5   end of a romantic relationship – that renders Bankston extremely violent reaction troubling.
6   In fact, Bankston maintains that he is currently engaged and plans to get married upon his
7   release.  It is therefore possible that Bankston may find himself again in the situation that led
8   to the offense.

9        In sum, the Board's conclusion that the manner in which Bankston committed his
10  offense provides evidence of his unsuitability for parole is supported only by the trivial
11  nature of the motive which triggered the offense.  It is far from clear to this Court that a
12  trivial motive, without more, would provide "some evidence" that Bankston *currently* poses
13  an unreasonable danger to the public.  Bankston's offense occurred almost twenty years
14  before the March 2005 parole hearing.  As both the Ninth Circuit and the California courts
15  have recognized, a parole Board's "continued reliance . . . on an unchanging factor, [such as]
16  the circumstance of the offense . . ., runs contrary to the rehabilitative goals espoused by the
17  prison system and could result in a due process violation."  *Biggs v. Terhu*ne, 334 F.3d 910,
18  917 (9th Cir. 2003); *In re Scott*, 133 Cal. App. 4th 573, 595 (2005) ("[T]he predictive value
19  of the commitment offense may be very questionable after a long period of time.").

20       Crucially, the Board did not, however, rely solely on the nature of Bankston's
21  commitment offense in finding him unsuitable for parole.  Rather, it also found that Bankston
22  posed an unreasonable risk of danger to the community because he lacked insight into his
23  crime and failed to participate in adequate self-help and programming while prison.  These
24  later findings were supported by the record. Moreover, this Court finds that the combination
25  of Bankston's lack of insight, his failure to engage in adequate self-help, and the
26  commonplace motive for his crime provides "some evidence" for the Board's conclusion that
27  he currently poses an unreasonable risk of danger to society if released.

28

11

Though Bankston acknowledges that the crime was his "fault," he has steadfastly maintained that the murder was a horrible accident, that he did not fire the weapon that killed his fiancee, and that he did not attempt to cover-up the crime. These contentions, of course, run directly counter to the physical evidence recovered the scene. That evidence includes the lack of gunpowder residue on Bankston's headboard or bedsheets, the fact that the gun could not have fired without the trigger being pulled, and the presence of bloodstains inside the bathroom and on the base of two bullets found on the headboard. Perhaps not surprisingly, Bankston has been unable to produce a plausible explanation for the abundant physical evidence that contradicts his story. Under California law, Bankston's ongoing refusal to acknowledge or adequately explain the circumstances of the crime alone provide some evidence to support the Board's conclusion that Bankston poses an unreasonable risk of danger to the community. *See In re McClendon*, 113 Cal. App. 4th 315, 322 (2003) (holding that the prisoner's adherence to a version of events that ran counter to the overwhelming evidence provided "some evidence" of his continuing dangerousness).

The Board's concerns about Bankston's lack of insight find additional support in Dr. Walker's psychological profile. In that profile, Dr. Walker expressly states that he elevated his assessment of Bankston's risk of future violence – albeit from "low" only to "low to moderately low" – precisely because of "[Bankston's] denial of events as reportedly transpired." The Board was therefore not alone in considering Bankston's lack of insight as factor that increases the likelihood that he will engage in violence if released.

Bankston argues that it was improper for the Board to rely on his lack of insight because, under California law, the Board cannot require an "admission of guilt" as a prerequisite to granting parole. Cal. Penal Code § 5011. California courts have held, however, that the Board may consider a lack of insight as a factor weighing against parole without violating § 5011 if the prisoner's version of events is "physically impossible [or] strain[s] credulity such that his denial of an intentional killing [is] delusional, dishonest, or irrational." *See In re Palermo*, 171 Cal.App.4th 1096, 1112 (2009) (citing *In re Shaputis*, 44 Cal. 4th 1241 (2008) and *In re McClendon*, 113 App. 4th 315 (2003)). As noted by the Board

1 and discussed above, Bankston's version of events is completely contrary to the physical
2 evidence, and, at least according to the state's forensic expert, "physically impossible."
3 Bankston has likewise been unable to plausibly explain the contradictory evidence.  As a
4 result, Bankston's account "strains credulity such that his denial of an intentional killing [is]
5 delusional, dishonest, or irrational." *Id.*  The Board therefore did not violate § 5011's
6 prohibition against requiring an admission of guilty when it considered Bankston's lack of
7 insight as a factor weighing against his suitability for parole.

In addition to a lack of insight, Bankston's failure to participate in adequate programming and self-help also provides some evidence of his current dangerousness.  At each of the three parole hearings that took place prior to the one at issue in this case, the Board recommended that he engage in additional self-help and therapy.  The Board emphasized, in particular, that Bankston seek out help in "understand[ing] and cop[ing] with stress in a nondestructive manner."  Yet Bankston has continually failed to do so.  He has worked successfully in the prison shop as a woodworker for a very long time.  He also participated in the early 1990s in two programs targeting at-risk youths.  But he has consistently failed, despite repeated advice from the Board, to engage in programming or therapy that target his ability to deal with stress or the circumstances of his crime.  Though Bankston contends that such programs are not available (a dubious assertion in the Board's view), he has not engaged even in self-study.  Moreover, aside from Bankston's work in the woodshop, the record indicates that he has engaged in almost no self-help or other programming since the early 1990s, fifteen years before the parole hearing at issue in this case.  In short, although Bankston has engaged in some programming and self-help, he has not participated in programs that target his ability to deal with stress in a reasonable manner and has not participated in any significant self-help, including self-study, in many years.  This nonparticipation provided the Board with additional evidence that he would pose a danger to society if released.  *See Van Houten*, 116 Cal. App. 4th at 355 (holding that the parolee's "lack of insight into her participation in a horrendous crime, as well as her recent

13

1  nonparticipation in self-help programs," provided "some evidence" in support of a parole
2  denial).

3      Bankston's need for self-help is also supported by the opinion of psychologist Walker.
4  At the end of his report, Walker stated that "[o]ngoing education, and involvement in self-
5  help, self study (bibliotherapy), or introspective treatment groups (if available to life term
6  inmates wihtout mental health issues) is encouraged."  Thus, Walker too felt that additional
7  therapy would be beneficial for Bankston, even though he, like other state psychologists,
8  considered Bankston to present a relatively low risk of danger to the public.

9      To summarize: Bankston's lack of sufficient insight into his crime and his failure to
10 participate in adequate self-help provide "some evidence" that he poses an unreasonable risk
11 of danger to the community.  Given that the circumstance which precipitated Bankston's
12 crime – i.e., a threatened breakup – is not at all uncommon and that Bankston may very well
13 find himself in that situation in the future, his lack of insight and self-help is particularly
14 troubling.  This Court therefore concludes that the California state courts did not
15 unreasonably apply the "some evidence" standard in denying Bankston habeas petition.

16     **2.    Bankston's Additional Arguments**

17     Bankston raises three additional challenges to the Board's determination that he is
18 unsuitable for parole.  First, he maintains that *Cal. Code Regs., tit.* 15, § 2402(c)(1), which
19 provides that a prisoner may be found unsuitable for parole if the Board determines that he
20 committed his offense in an "especially heinous, atrocious or cruel manner," is
21 unconstitutionally vague.  As a result, Bankston maintains, the Board's reliance on §
22 2402(c)(1) in denying him parole was improper.

23     This Court need not address this argument.  As explained above, Bankston's lack of
24 insight and failure to participate in self-help provide "some evidence" of his current risk to
25 society.  Therefore, even if the Board's reliance on the manner in which Bankston committed
26 his offense was erroneous, for whatever reason, the Board's conclusion that he was
27 unsuitable for parole did not violate Bankston's due process rights.  *See Biggs*, 334 F.3d at
28 915-16 (finding no constitutional violation even though "many of the conclusions reached

14

1 and factors relied on by the Board were devoid of evidentiary basis" because "some
2 evidence" nonetheless supported the Board's decision that the prisoner was unsuitable for
3 parole).

4 Next, Bankston argues that the California Supreme Court's holding in *In re
5 Dannenburg*, in which the Court provided guidance on what crimes qualify as "especially
6 heinous" under § 2402(c)(1) and upon which the Board relied in Bankston's case, was an
7 impermissible "retroactive judicial enlargement" of a criminal statute. This argument is moot
8 for the same reason as the previous one. Evidence of Bankston's lack of insight and
9 nonparticipation in self-help supported the Board's unsuitability finding, even if its
10 determination that Bankston had committed his crime in an "especially heinous, atrocious or
11 cruel manner" was in error. *See Biggs*, 334 F.3d at 915-16.

12 Finally, Bankston asserts that the Board's denial of parole "offends the rules
13 announced by the United States Supreme Court" in *Apprendi v. New Jersey*, 530 U.S. 466
14 (2000); *Blakely v. Washington*, 542 U.S. 296 (2004); and *Cunningham v. California*, 127
15 S.Ct. 856 (2007). Specifically, Bankston maintains that the Board's "findings that support
16 the denial of parole suitability act as both a literal and effective" augmentation of Bankston's
17 sentence and therefore must be decided by a jury. *See Apprendi*, 530 U.S. at 490 (holding
18 that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime
19 beyond the prescribed statutory maximum must be submitted to a jury").

20 Bankston's argument is without merit. First of all, the Board's unsuitability finding
21 did not "increase[] the penalty for [Bankston's] crime beyond the statutory maximum."
22 *Apprendi*, 530 U.S. at 490. Bankston's sentence both before and after the 2005 parole
23 hearing was the same: life with the possibility of parole. In any event, the Ninth Circuit has
24 held that "[t]here is no right to a jury for . . . post-conviction determinations," such as parole.
25 *See United States v. Huerta-Pimental*, 445 F.3d 1220, 1225 (9th Cir. 2006) (citing *Morrissey
26 v. Brewer*, 408 U.S. 471, 480-88 (1972)). Bankston's argument that he had a right to a jury
27 in his parole hearing therefore fails.
28

## CONCLUSION

For the reasons discussed above, the Court finds that "some evidence" supported the Board's conclusion that Bankston would pose an unreasonable risk of danger to society if released from prison. The state court therefore did not apply Supreme Court law in an unreasonable manner when it denied Bankston's habeas petition. Accordingly, Bankston's federal habeas petition is also DENIED.

**IT IS SO ORDERED.**

Dated: March 30, 2010

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California